IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BRUNO GIBSON,

                    Plaintiff,

         v.                                Civil No. 09-6486-NLH-JS

CARL MUELLER, et al.,

                    Defendants.            **OPINION**

Appearances:

GEORGE R. SZYMANSKI
LAW OFFICES OF GEORGE R. SZYMANSKI
1370 CHEWS LANDING ROAD
LAUREL SPRINGS, NJ 08021
*Attorney for plaintiff*

MICHAEL O. KASSAK
DAVID M. RAGONESE
WHITE & WILLIAMS, ESQS.
457 HADDONFIELD ROAD
SUITE 400
CHERRY HILL, NJ 08002-2220
*Attorney for defendants*

**HILLMAN**, District Judge

        Before the Court is defendants' motion for summary
judgment seeking to dismiss plaintiff's excessive force claim,
and plaintiff's motion for reconsideration of this Court's Order
dismissing his conspiracy claims.  For reasons set forth below,
defendants' motion will be granted in part and denied in part,
and plaintiff's motion will be denied.

        I.   **JURISDICTION**

        Plaintiff has alleged that during his arrest,

defendants used excessive force in violation of his Fourth
Amendment rights and, therefore, this Court exercises subject
matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal
question jurisdiction).

**II.   BACKGROUND**

**A.  Factual Background**

On November 17, 2007, at approximately 4:00 a.m.,
plaintiff Bruno Gibson, an African-American male, was driving his
1998 white convertible on New Freedom Road, a two-lane road, in
Winslow Township, New Jersey.[1]  He was driving behind a Winslow
Township police vehicle operated by defendant Patrolman Carl
Mueller.  In order to pass Mueller, Gibson entered into the
oncoming traffic lane, over a dotted line, and reentered into the
right lane.[2]  Gibson testified that he was not aware that it was
a police car he was passing.

Mueller put on his police siren and Gibson pulled his
car to the side of the road and stopped.  At this time the video

---

[1] For purposes of summary judgment, the facts are viewed in
the light most favorable to plaintiff.  However, in his brief,
some of plaintiff's "facts" are not substantiated by the record.
In those instances, the Court will rely on plaintiff's deposition
testimony.

[2] Plaintiff's brief states that "without activating his turn
signal, Mr. Gibson went back into the lane ahead of the police
vehicle."  Gibson testified, however, that he used his turn
signal.  Gibson Tr. at 26:7-9.

camera was turned on in Mueller's police vehicle.[3]   Mueller got out of his vehicle and approached Gibson's driver side window. Although the camera shows the events, at this time, there is no sound recording outside of the police car, and therefore, the statements are based on testimonial evidence.  Mueller asked Gibson for his license, registration, and insurance card.  After Gibson gave them to Mueller, Mueller told Gibson to "get the fuck out of the car."  Gibson testified that Mueller had one hand on his flashlight and the other on his gun which was part way out of the holster.  The video depicts Mueller using a flashlight with his left-hand to see into the car and shows his right hand resting on the holster but Mueller does not unholster the gun. Mueller states that he smelled alcohol on Gibson's breath, but Gibson maintains that he had consumed only two beers hours earlier and had eaten and had drunk water since then.

Mueller then instructed Gibson to walk over to the front of the police vehicle, in between the two cars.  The video

---

[3] The facts as depicted in the videotape are included because the video is part of the record and, therefore, the Court must rely on the video in ruling on summary judgment.  See Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769 (2007) (finding that  the Court of Appeals "should have viewed the facts in the light depicted by the videotape."); Ference v. Township of Hamilton, 538 F.Supp.2d 785, 789 (D.N.J. 2008) ("The videotape is also likely the best available evidence of the events at issue in this case.  Thus, the videotape will be considered as part of the record.").

shows that Gibson placed his hands on his head while Mueller checked Gibson's coat pockets and behind his back, and then Gibson removes his coat and places it on the trunk of his car. Mueller then conducts a field sobriety test.  Gibson states he gave him sloppy instructions to stand on one leg, and also told him to walk in a straight line.  The video depicts Mueller demonstrating standing, with arms at his side, and lifting his foot.  It is unclear from the video tape whether Gibson fails to follow Mueller's example but a reasonable juror could conclude that Mueller repeated the instruction for some reason.  The video then depicts Mueller demonstrating how to walk heel-to-toe, putting one foot in front of the other in a straight line. Gibson appears to walking in the manner demonstrated by Mueller, albeit more slowly and with less precision.

Mueller then approaches Gibson from behind, takes his left arm and places a handcuff on his left wrist.  The video depicts Gibson then turning around and backing up while Mueller tries to grab Gibson's right arm.  Mueller then gets a hold of Gibson's arm, pulls him over to the back of the Firebird and forces him, head first, onto the back on the trunk in order to handcuff Gibson.  At that time, Winslow Township police officer Lucas Mitchell arrived and ran over to assist handcuffing Gibson. The video depicts that the officers struggled for some time before finally securing Gibson in handcuffs.

4

After he was handcuffed, Mueller then walked Gibson to the police car where he hits the side of the hood with force loud enough to make a pronounced "thud' in the audiotape. Mueller appears on the video to be frisking Gibson's pants pockets. Mueller then walks Gibson to the side of the police car. At this point, Mueller and Gibson are no longer visible on the camera. Gibson testifies that the officers slammed him against the police car, then put him on the ground and started kicking him and hitting him with closed fists. He testified that at first, two officers were punching him and then around seven officers joined in. He said he did not hear the officer say he would be sprayed with a "cap-stun"[4] or pepper spray, but that he was sprayed about five or six times in the eyes. He states he was dragged into the back seat of the police car where he had an asthma attack and a seizure. Gibson stated that after twenty minutes he was drug on the ground, with his face on the ground "like an animal" and put on a stretcher.

Although it is not possible to see the events that occurred after Gibson was taken to the side of police car, it is possible to hear their verbal exchange. The videotape was left running and their voices could be heard. Gibson can be heard yelling "oh my God, you broke my back" and one or more officers

---

[4] It appears that Gibson was sprayed with Oleoresin Capsicum.

can be heard shouting "get in the car."  An officer then shouts
"get in the car, or you're going to get sprayed," to which Gibson
answers "what's going on?"  Gibson is then instructed to get on
the ground and if he gets up again, he will get sprayed.  Gibson
states "Sir, I didn't do nothing; trying to break my back; I have
back problems."  Mueller then keeps shouting for Gibson to stop
moving.  It then sounds as if an altercation occurs, with the
officers continuing to yell at Gibson to get in the car, and
Gibson screaming "oh my back; oh my head; what did I do."  During
this exchange, it appears that Gibson was sprayed with cap-stun.
Again, we hear voices yelling for Gibson to get in the car or he
will get sprayed again.  One of the officers then inquires about
shackles and yells at Gibson to stop trying to get up.

        Gibson can be heard coughing and complaining that he
cannot move and cannot breath.  Someone asks Gibson if he will
get into the car willfully.  Gibson is shortly thereafter in the
backseat of the police vehicle.  Gibson can be heard breathing,
and yelling, "oh my God" a few times.  Later in the recording he
sounds as if he is spitting or coughing and intermittently
yelling, "aaahhhh."  Then the door to the police car opens and
Gibson states, "my face is on fire, man, oh my God; I'm having an
asthma attack; I'm going to die."  Asked if he had his inhaler,
Gibson responded that he did not.  Gibson continues to repeat
that he cannot breathe and that he is going to die.  One of the

6

officers on the scene calls for an ambulance.  There is also a voice that states, "here, breathe the oxygen; relax, keep the mask on."

Gibson testified that he was put in the ambulance, but denies that he spit on the EMT or that he tried to knock the oxygen mask off.  Gibson also testified that he arrived at the hospital "half dead" and denies that he was yelling, cursing, or spitting at anyone, or that he had to be sedated.

Several members of Gibson's family also testified as to the events that occurred during the arrest.  The spot where Mueller pulled Gibson over happened to be in front of his parent's home in Sicklerville, New Jersey.  Gibson's sister, father, mother and brother came out after hearing their dog barking.  Gina Gibson, plaintiff's sister, testified that she saw Gibson on the ground, handcuffed and shackled, and that he was surrounded by at least four police officers.  She testified that she saw the police officers kicking Gibson's legs, below the knee.  She said that it was very cold outside and Gibson did not have his jacket on and his pants and underpants had fallen down so that his buttocks was visible.  She testified that she did not see any of the officers punching or hitting Gibson.  Gina stated that she heard her brother screaming that he could not breathe.

Gina also testified that she witnessed the police drag Gibson onto a stretcher and put him on the stretcher face down.

7

She stated that after arriving at the hospital where Gibson was taken, she saw that his face was bruised and cut with dried blood, and that his wrists were swollen. She also testified that his eyes were really red and that she believed it was from the mace which she could smell. She testified that Gibson was handcuffed to the hospital bed.

Gibson's father, Robert Gibson, testified that the police had Gibson on the ground "with a knee in the back." He heard Gibson yelling that he could not breathe and heard the police yelling for Gibson to get in the car. Robert testified that several police "grabbed him up" but that Gibson was unable to move to get into the car. Robert testified that he saw the police officers kick Gibson about eight times around his legs and back while he was on the ground. He testified that the officers had Gibson upside down and were slamming his head on the car and on the ground. After the ambulance arrived, Robert testified that the police had Gibson upside down and dragged him to the ambulance. At the hospital, Robert testified that Gibson's face was swollen and cut, and that he was handcuffed to the bed.

Gibson's mother, Gloria Gibson, testified that she saw a police officer giving Gibson a sobriety test. She testified that she saw the officer handcuff Gibson and then slam his head on the hood of the car. She testified that the police officers wanted him to get in the car and that Gibson "wondered why [he]

8

was getting into the car." She stated that the officers dragged Gibson and pinned him down. She heard Gibson say that he could not breathe and that he had asthma. She also testified that the officers dragged Gibson from the car and onto the stretcher to be put inside the ambulance. She stated that at the hospital, Gibson was handcuffed to the hospital bed and his face was swollen with cuts.

Gibson's brother, Gary Gibson, testified that he saw about five officers surrounding Gibson, pulling, grabbing, and kicking him, and that one officer was on top of Gibson with his knees in his back. He said he heard his brother screaming he could not breathe and that he had pain in his back. Gary testified that the officers continued to hold Gibson down after Gibson said that he was hurt. He testified that after the ambulance arrived, they took his limbs and dragged him on the ground over to the stretcher. Gary testified that Gibson was not resisting treatment but was screaming because he was in pain. He also testified that at the hospital, Gibson was bruised, swollen and could barely talk. None of plaintiff's family testified that they saw any of the officers punch Gibson with closed fists or use a baton or other weapon to strike Gibson.

Joseph Weber, Sr., the EMT who arrived with the ambulance testified that Gibson was "agitated and combative," meaning "a little bit violent." He testified that Gibson was re-

9

handcuffed in order put Gibson's arms in front of him, but that Gibson started "wailing his arms" and he was re-handcuffed with his arms behind him.  Weber testified that Gibson kept shaking his head and knocking his oxygen mask off.  He also testified that Gibson was spitting at him while in the ambulance.

Rajinder Chugh, M.D. treated Gibson after he was taken to the hospital.  Dr. Chugh testified that Gibson was "combative and screaming" when he was brought into the ER which required that he be given two doses of the medication Haldol to sedate him.  Dr. Chugh testified that Gibson was restrained while in the hospital due to risk of harm to the hospital staff.  He stated that Gibson's blood alcohol level was 190, which is considered high.

Gibson was discharged from the hospital and charged with aggravated assault on a police officer, resisting arrest, throwing bodily fluids at a law enforcement officer, and possession of drug paraphernalia.  He was also charged with the traffic offenses of driving while intoxicated, failure to signal and reckless driving.  Gibson pleaded guilty to aggravated assault in exchange for dismissal of the remaining criminal charges.  He was found guilty of driving while intoxicated after a municipal trial.

### B. Procedural Background

On July 6, 2010, this Court granted in part and denied

10

in part defendants' Motion for Partial Judgment on the Pleadings and dismissed with prejudice plaintiff's Eighth Amendment and Fourth Amendment malicious prosecution claims, and dismissed without prejudice, plaintiff's §§ 1985(3) and 1986 conspiracy claims.  The Court granted plaintiff leave to file an amended complaint with respect to his §§ 1985(3) and 1986 conspiracy claims.  Plaintiff filed an amended complaint on July 30, 2010, which was identical to his original complaint except for the additional sentence: "defendants were motivated at all times by racial prejudice toward the plaintiff."  Defendants again moved for judgment on the pleadings which motion the Court granted and dismissed plaintiff's §§ 1985(3) and 1986[5] conspiracy claims with prejudice because plaintiff failed to allege facts that could support a conspiracy claim.

Defendants now move for summary judgment on plaintiff's remaining Fourth Amendment claim for excessive force.

III. **DISCUSSION**

A.   **Defendants Anthony Rao and Pascal Chavanon**

As an initial matter, plaintiff concedes that these two defendants should be dismissed.  Therefore, defendants' motion for summary judgment will be granted as to defendants Anthony Rao

_____

[5] Plaintiff's § 1986 claim was dismissed because liability under § 1986 is dependent on § 1985 liability and Plaintiff failed to establish a claim under § 1985. Clark v. Clabaugh, 20 F.3d 1290, 1296 n. 5 (3d Cir. 1994).

and Pascal Chavanon and they shall be dismissed from this matter.

### B.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.

12

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the
moving party has met this burden, the nonmoving party must
identify, by affidavits or otherwise, specific facts showing that
there is a genuine issue for trial.  Id.  Thus, to withstand a
properly supported motion for summary judgment, the nonmoving
party must identify specific facts and affirmative evidence that
contradict those offered by the moving party.  Anderson, 477 U.S.
at 256-57.  A party opposing summary judgment must do more than
just rest upon mere allegations, general denials, or vague
statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.
2001).

        The rule that all reasonable inferences are to be drawn
in favor of the non-moving party is qualified if an authenticated
videotape of material events is part of the record.  Under this
circumstance, the Court will not draw inferences in favor of the
non-moving party that are inconsistent with the events depicted
on the videotape.  Scott, 550 U.S. at 380; Ference, 538 F.Supp.2d
at 789 (stating the court will not draw inferences in plaintiff's
favor that are inconsistent with the videotape).  "When opposing
parties tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could
believe it, a court should not adopt that version of the facts
for purposes of ruling on a motion for summary judgment."  Scott,
550 U.S. at 380.

13

### C.   Defendants' Motion for Summary Judgment

Plaintiff alleges that defendants violated his rights under the Fourth Amendment, and under 42 U.S.C. § 1983.  The Court interprets plaintiff to allege that he brings his claim of Fourth Amendment violation pursuant to 42 U.S.C. § 1983.[6]  To state a claim under § 1983, a plaintiff must establish that (1) the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States and (2) the conduct challenged was committed by a person acting under color of state law.[7]  Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); Shuman ex rel. Shertzer v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005).

Defendants argue that plaintiff's claim for excessive

─────────────

[6] Section 1983 does not create any new substantive rights; rather it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere. Doe v. Delie, 257 F.3d 309, 314 (3d Cir. 2001) (citing Baker v. McCollan, 443 U.S. 137, 144 n. 3 (1979)).

[7] Section 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

force should be dismissed because the force used on plaintiff was objectively reasonable and that defendants are entitled to qualified immunity.

### 1.   Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Montanez v. Thompson, 603 F.3d 243, 249-50 (3d Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)).  "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 129 S.Ct. at 815 (2009).  This doctrine provides a government official immunity from suit rather than a mere defense from liability.  Id.  A Court must undertake a two-step inquiry to determine the applicability of qualified immunity:

> First, a court must decide whether the facts that a
> plaintiff has alleged or shown make out a violation
> of a constitutional right.  Second, if the plaintiff has
> satisfied this first step, the court must decide
> whether the right at issue was clearly established at
> the time of a defendant's alleged misconduct.
> Qualified immunity is applicable unless the official's
> conduct violated a clearly established constitutional
> right.

15

Montanez, 603 F.3d at 250 (citations omitted). "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right." Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997). "Only if the plaintiff carries this initial burden must the defendant then demonstrate that no genuine issue of material fact remains as to the 'objective reasonableness' of the defendant's belief in the lawfulness of his actions." Id. (citing Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995)).

In determining whether a defendant is entitled to qualified immunity, the court is "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S.Ct. at 818.  If the answer to either question is "no," the analysis may end there.  See id. at 823 (finding that because the unlawfulness of the officers' conduct was not clearly established, the officers were entitled to qualified immunity, without having to answer the question of whether the officers violated the plaintiff's constitutional rights).  Whether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered

16

by the Court.  See Curley v. Klem, 499 F.3d 199, 211 (3d Cir. 2007).

Defendants argue that they are entitled to qualified immunity.  Plaintiff responds that defendants used excessive force during his arrest in violation of his Fourth Amendment rights.

### 2.    Fourth Amendment

"In an excessive force case, whether there is a constitutional violation is properly analyzed under the Fourth Amendment's objective reasonableness standard."  Curley, 499 F.3d at 206 (internal quotation marks omitted) (citing Graham v. Connor,490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).  "The relevant inquiry is the reasonableness of the officer's belief as to the appropriate level of force, which should be judged from [the officer's] on-scene perspective, and not in the 20/20 vision of hindsight."  Id. (internal quotation marks removed) (citing Saucier v. Katz, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

Applying the objective reasonableness standard requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. at 207

17

(citing Graham, 490 U.S. at 396).  A "totality of the
circumstances" test is applied which requires a "careful
balancing of the nature and quality of the intrusion on the
individual's Fourth Amendment interests against the
countervailing governmental interests at stake."  Id.; Garrison
v. Porch, 376 Fed.Appx. 274, 277 (3d Cir. 2010) ("In determining
whether or not the force used in effecting an arrest was
unreasonably excessive, a finder of fact is to consider the
totality of the circumstances surrounding the arrest.").  "The
balancing must be conducted in light of the facts that were
available to the officer."  Id. (citing Maryland v. Garrison, 480
U.S. 79, 85, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987)).

        In evaluating the proper test for objective
reasonableness, the Supreme Court has provided that "[n]ot every
push or shove, even if it may later seem unnecessary in the peace
of a judge's chambers, ... violates the Fourth Amendment."
Graham, 490 U.S. at 396 (citation omitted).  Rather, "[t]he
calculus of reasonableness must embody allowance for the fact
that police officers are often forced to make split-second
judgments—in circumstances that are tense, uncertain, and rapidly
evolving—about the amount of force that is necessary in a
particular situation." Id. at 396-97.

        In Cincerella v. Egg Harbor Tp. Police Dept., a court
in this district noted several factors the Third Circuit found

18

relevant in determining whether a plaintiff's treatment after handcuffing constituted excessive force.  These factors included:

> the intensity of the plaintiff's pain, the officer's awareness of the plaintiff's pain, whether the plaintiff asked to have the handcuffs removed and how long after those requests the handcuffs are removed, whether there were circumstances justifying a delay in removing the handcuffs, and the severity of the injury the plaintiff suffered.

Cincerella v. Egg Harbor Twp. Police Dept., No. 06-1183, 2009 WL 792489, at *10 (D.N.J. March 23, 2009) (citing Gilles v. Davis, 427 F.3d at 207-08 and Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004)).

As set forth above, there is extensive witness testimony and a videotape of plaintiff's arrest.  Viewing all the evidence in the record in the light most favorable to plaintiff, except for those instances which are contradicted by the videotape, there is a genuine dispute of material fact over whether the officers used excessive force during Gibson's arrest. In particular, during the time that Gibson and the arresting officers were not in visual range of the video, there is testimonial evidence as well as audio recording that raises the issue whether the force applied to Gibson was excessive after he was handcuffed and shackled.

In assessing the facts and circumstances of this case, Gibson was pulled over for reckless driving.  There is no testimony that the officers thought Gibson may have been armed.

Mueller suspected that Gibson was also driving while intoxicated based on the smell of alcohol.  The videotape depicts Mueller giving Gibson instructions for a field sobriety test and Gibson cooperating, albeit with some difficulty, to follow the instructions.[8]  Based on Gibson's performance, Mueller decided to arrest Gibson and the video shows that Gibson does turn around and pull his right arm away so that Mueller cannot effectively put the handcuff on his right wrist.  Officer Mitchell arrives and the two officers struggle to get Gibson handcuffed while Gibson's chest and face are facing the hood of his car.  At this point, there is no excessive force.  Reasonable minds could not differ that the force expended was necessary to effectuate the arrest.

Gibson is then taken over to the side of the police car and the officers and Gibson are no longer on video, although their voices can be heard on the tape.  There is no dispute of fact that Gibson was handcuffed behind his back, that he was eventually shackled around his ankles, that he was sprayed with cap-stun at least two times, and that the police had to use force to get Gibson in the back of the car.  There is also no dispute that Gibson told the officers his back hurt and that he was having trouble breathing.

---

[8] Gibson was found guilty in state court proceedings of driving while intoxicated in violation of N.J.S.A. 39:4-50.

The issue raised at this point is whether the force used by the arresting officers was unreasonable in light of Gibson's resistance to be handcuffed and his resistance to get into the back of the police car.[9]  There is testimony that Gibson was on the ground, with an officer's knee in his back, and that several officers were kicking him while he was on the ground. Gibson and several witnesses testified that he was not resisting at that time.  The defendants' version is that Gibson was resisting arrest, kicking them, and refusing to cooperate by getting in the police car.  There is also testimony that when the ambulance arrived, while handcuffed and shackled, Gibson was dragged over to the stretcher and that his face was cut and swollen upon arriving at the hospital.  Contrary to plaintiff's assertion that he was cooperative at that time, witness testimony described him as combative and trying to spit on the officers and EMT.  Although the Court will not make inferences in plaintiff's favor that are contradicted by the videotape, during the time that plaintiff was on the ground, he and the officers are not

---

[9] Defendants state that even if defendants violated plaintiff's constitutional right, that right was not clearly established because "there are no reported cases in which an officer violates the Fourth Amendment when he uses force to effectuate an arrest in which the arrestee assaults the officer and resists arrest."  Since there is a dispute of material fact concerning the events during the arrest that must be decided by a jury, the Court does not reach the issue of whether the right was clearly established.  The Court does note, however, that there is an abundance of case law regarding the parameters of use of force during an arrest with respect to the Fourth Amendment.

visible on the camera.  Their voices and other sounds can be
heard, but the verbal exchanges are not conclusive one way or the
other.  There is no videotape, visual or audio, during the time
that plaintiff was being put into the ambulance.

In their reply, defendants argue that this Court cannot
accept any fact asserted by plaintiff, even if there is support
for it in the record, that implies the invalidity of plaintiff's
state court conviction of aggravated assault.[10]  Defendants argue
that plaintiff's assertion that he followed "every instruction"
of the police officers and got in the car voluntarily should not
be considered because it would imply the invalidity of his
conviction for aggravated assault against Mueller and also
contradicts what is depicted in the videotape.

Plaintiff was convicted of aggravated assault on a
police officer, third degree, N.J.S.A. 2C:12-1b(5)(a).[11]  The
Court agrees that plaintiff's blanket statement that he followed

_____

[10] It appears that defendants are not arguing that
plaintiff's pleading guilty to aggravated assault *bars* his
Section 1983 action under Heck v. Humphrey, 512 U.S. 477, 114
S.Ct. 2364, 129 L.Ed.2d 383 (1994), only that certain facts as
alleged in his Section 1983 claim contradict facts found in
support of his state court conviction.

[11] That statute states: "A person is guilty of aggravated
assault if he ... [c]ommits a simple assault as defined in
subsection a. (1), (2) or (3) of this section upon ... [a]ny law
enforcement officer acting in the performance of his duties while
in uniform or exhibiting evidence of his authority or because of
his status as a law enforcement officer." N.J.S.A. 2C:12-
1b(5)(a).

every direction and voluntarily got into the police car should not be accepted as true because it contradicts the videotape and would imply the invalidity of his conviction of aggravated assault on a police officer.  However, as the lengthy recitation of the deposition testimony and events depicted on the videotape show, even though Gibson clearly did not cooperate with the officers during initial part of the arrest, there is an issue whether force was used by the defendants before or after Gibson was handcuffed and shackled on the ground.  Also, defendants have not alleged the specific facts in support of the underlying state court conviction for aggravated assault that would undermine his allegation in this case that the officers used unreasonable force while he was on the ground.  See Lora-Pena v. F.B.I., 529 F.3d 503, 506 (3d Cir. 2008) (finding 1983 claim not barred even though plaintiff convicted of resisting arrest and assaulting federal officers because issue of whether officers used excessive force was not put before jury in criminal matter); Hendrix v. City of Trenton, No. 06-3942, 2009 WL 5205996, at *13 (D.N.J. Dec. 29, 2009) (concluding that Heck did not bar excessive force claim where plaintiff resolved charges of aggravated assault and resisting arrest by participating in New Jersey's pretrial intervention program).[12]

---

[12] Although defendants provided two pages of transcripts from the underlying criminal proceedings, there was no testimony in those two pages for the Court to consider whether Gibson did in

Ultimately, whether the plaintiff's version is to be believed comes down to credibility.  A jury must resolve the disputed issues of fact by determining whose story to credit. Once the jury has done so, the Court may then determine whether defendants acted reasonably during the situation as found by the jury.  This approach will allow the jury to make findings on questions of fact, and then allow the Court to make the ultimate determination of law as to whether Defendant is entitled to qualified immunity.  See Curley v. Klem, 499 F.3d 199, 211, 211 n. 12 (3d Cir. 2007) ("When the ultimate question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, ... but responsibility for answering that ultimate question remains with the court."); see also id. at 225–26 (dissenting opinion) (internal citations omitted) ("[I]f factual disputes relevant to [the step-two] legal analysis do exist, the court will have to postpone making this determination until the jury resolves all the relevant factual disputes, because determining what actually happened is a prerequisite to determining whether the law clearly established

_____

fact admit that defendants' use of force was reasonable.  See Ali v. Rando, No. 09–4956, 2011 WL 4499261, at *7–8 (D.N.J. Sept. 26, 2011) (where defendant provided transcript of state court criminal proceedings in which plaintiff admitted that he did not cooperate with the officers during his arrest, that he refused to be handcuffed, and that he pushed the officer).

that a particular action was permitted or prohibited by the
Fourth Amendment under those circumstances.  After the jury
resolves these relevant fact disputes, presumably through the use
of special interrogatories, the court is then capable of deciding
whether or not the law clearly permitted or prohibited the
conduct constituting the constitutional violation.").

Thus, defendant's motion for summary judgment on
plaintiff's excessive force claim for the remaining defendants
will be denied.

### D.  Motion for Reconsideration

Plaintiff filed a motion asking the Court to reconsider
the Order entered on December 21, 2010, and to restore
plaintiff's Section 1985(3) and 1986 conspiracy claims.
Plaintiff claims that this Court dismissed his conspiracy claims
because he did not put the words "meeting of the minds" in his
amended complaint.  Plaintiff then simply refers to his
opposition to defendant's motion for summary judgment in which he
"cites to ample evidence in the record, in the form of the
transcripts of numerous depositions taken of non-party witnesses
to the plaintiff's beating, which would support a finding that
there was a meeting of the minds among defendants."  Defendants
oppose plaintiff's motion on grounds that the motion is untimely
and because no grounds exist to grant reconsideration.

In the District of New Jersey, Local Civil Rule 7.1(I)

governs motions for reconsideration.[13]  <u>Bowers v. Nat'l.</u>

<u>Collegiate Athletics Ass'n.</u>, 130 F.Supp.2d 610, 612 (D.N.J.

2001).  Pursuant to Rule 7.1(I), "a motion for reconsideration

shall be served and filed within 14 days after the entry of the

order or judgment on the original motion by the Judge" and

submitted with a "brief setting forth concisely the matter or

controlling decisions which the party believes the Judge ... has

overlooked."

        The standard for reargument is high and reconsideration

is to be granted only sparingly.  See <u>United States v. Jones</u>, 158

F.R.D. 309, 314 (D.N.J. 1994).  The movant has the burden of

demonstrating either: "(1) an intervening change in the

controlling law; (2) the availability of new evidence that was

not available when the court [issued its order]; or (3) the need

to correct a clear error of law or fact or to prevent manifest

---

        [13] Motions for reconsideration are not expressly recognized
in the Federal Rules of Civil Procedure.  <u>United States v.</u>
<u>Compaction Sys. Corp.</u>, 88 F.Supp.2d 339, 345 (D.N.J. 1999).
Generally, a motion for reconsideration is treated as a motion to
alter or amend judgment under Fed.R.Civ.P. 59(e), or as a motion
for relief from judgment or order under Fed.R.Civ.P. 60(b).  <u>Id</u>.
For the same reasons that plaintiff's motion is denied on the
merits under the Local Rule, it is denied under the Federal
Rules.  <u>See</u> <u>Holsworth v. Berg</u>, 322 Fed.Appx. 143, (3d Cir. 2009)
(construing motion for reconsideration as the functional
equivalent of a Rule 59(e) motion to alter or amend a judgment
which requires either "(1) an intervening change in controlling
law; (2) the availability of new evidence not available
previously; or (3) the need to correct clear error of law or
prevent manifest injustice.").

26

injustice." Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)(citing N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).  The Court will grant a motion for reconsideration only where its prior decision has overlooked a factual or legal issue that may alter the disposition of the matter.  U.S. v. Compaction Sys. Corp., 88 F.Supp.2d 339, 345 (D.N.J. 1999); see also L.Civ.R. 7.1(g). "The word 'overlooked' is the operative term in the Rule."  Bowers v. Nat'l. Collegiate Athletics Ass'n., 130 F.Supp.2d 610, 612 (D.N.J. 2001)(citation omitted); see also Compaction Sys. Corp., 88 F.Supp.2d at 345.

Reconsideration is not to be used as a means of expanding the record to include matters not originally before the court.  Bowers, 130 F.Supp.2d at 612-13; Resorts Int'l. v. Greate Bay Hotel and Casino, Inc., 830 F.Supp. 826, 831 n. 3 (D.N.J. 1992); Egloff v. New Jersey Air National Guard, 684 F.Supp. 1275, 1279 (D.N.J. 1988).  Absent unusual circumstances, a court should reject new evidence which was not presented when the court made the contested decision.  See Resorts Int'l, 830 F.Supp. at 831 n. 3.  A party seeking to introduce new evidence on reconsideration bears the burden of first demonstrating that evidence was unavailable or unknown at the time of the original hearing.  See Levinson v. Regal Ware, Inc., No. 89-1298, 1989 WL 205724, at *3 (D.N.J. Dec. 1, 1989).

Moreover, L.Civ.R. 7.1(g) does not allow parties to restate arguments which the court has already considered.  See G-69 v. Degnan, 748 F.Supp. 274, 275 (D.N.J. 1990).  Thus, a difference of opinion with the court's decision should be dealt with through the normal appellate process.  Bowers, 130 F.Supp.2d at 612 (citations omitted); Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F.Supp. 159, 162 (D.N.J. 1988); see also Chicosky v. Presbyterian Medical Ctr., 979 F.Supp. 316, 318 (D.N.J. 1997); NL Industries, Inc. v. Commercial Union Ins. Co., 935 F.Supp. 513, 516 (D.N.J. 1996) ("Reconsideration motions ... may not be used to re-litigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.").  In other words, "[a] motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple." Tishcio v. Bontex, Inc., 16 F.Supp.2d 511, 532 (D.N.J. 1998) (citation omitted).

First, plaintiff's motion is untimely.  The Order was entered on December 12, 2010.  Plaintiff did not file his motion for reconsideration until November 16, 2011, almost a year after the Order was entered.  This is well beyond the 14 day requirement and, therefore, plaintiff's motion will be denied as untimely.

Second, plaintiff's two-page brief consists of quotes from two cases, Griffin v. Breckenridge, 403 U.S. 88 (1971), and

Hampton v. Hanrahan, 600 F.2d 600 (7th Cir. 1979).  Two cases
decided in 1971, and 1979, respectively, do not present an
"intervening change in the law" regarding a matter decided in
2010.

Third, plaintiff mistakenly interprets the Court's
Order as requiring that he only needed to include the words
"meeting of the minds" in his complaint in order to have
successfully plead a claim for conspiracy.  As explained in the
Court's Order:

> To demonstrate a conspiracy pursuant to § 1985©),
> Plaintiff must allege "(1) a conspiracy; (2) for the
> purpose of depriving, either directly or indirectly,
> any person or class of persons of the equal protection
> of the laws, or of equal privileges and immunities
> under the laws; and (3) an act in furtherance of the
> conspiracy; (4) whereby a person is injured in his
> person or property or deprived of any right or
> privilege of a citizen of the United States."  United
> Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO
> v. Scott, 463 U.S. 825, 828-29 (1983).  Courts have
> further opined that "[t]o constitute a conspiracy
> [under § 1985(3)], there must be a 'meeting of the
> minds.'" Estate of Oliva v. New Jersey, 579 F. Supp.2d
> 643, 678 (D.N.J. 2008) (quoting Startzell v. City of
> Phila., 533 F.3d 183, 205 (3d Cir. 2008)); see Shipley
> v. New Castle County, 597 F. Supp.2d 443, 450 (D. Del.
> 2009)("While the Complaint contains allegations of
> individual acts taken by each Defendant, other than to
> invoke the word "conspiracy", it fails to allege any
> facts from which one could infer an agreement or
> understanding among Defendants to violate Plaintiffs'
> constitutional rights, or to discriminate against them
> under § 1985. For the above reasons, the Court will
> grant the Motion To Dismiss the § 1985 claim").
> Plaintiff failed to plead any facts concerning a
> "meeting of the minds" among Defendants.

As clearly stated by the Court, plaintiff failed to

allege any "facts" concerning a "meeting of the minds" or that could give rise to a conspiracy claim, not that plaintiff simply failed to add the words "meeting of the minds" in his complaint.

Fourth, plaintiff's motion for reconsideration still does not allege any facts in support of a conspiracy claim. Although plaintiff directs the Court to his entire opposition brief and all the transcripts of all the non-party witnesses,[14] plaintiff fails to set forth concisely the matter which he believes the Court has overlooked.  See L.R. 7.1(I).

Fifth, the testimony of the non-party witnesses is not evidence that was previously unavailable.  See Damiano v. Sony Music Entertainment, Inc., 975 F.Supp. 623, 634 (D.N.J. 1996) ("[T]here is a strong policy against entertaining reconsideration motions based on evidence that was readily available at the time that the original motion was heard; and so the court may, in its

---

[14] We recognize that Plaintiff alleges concerted action rather than an express meeting of the minds to support his conspiracy claim but the plaintiff must do more that merely assert a legal conclusion or principle.  Asking a Court to simply read a brief in opposition to another motion and all the deposition transcripts in order to guess what facts plaintiff intends to prove in support of his conspiracy claim is not the appropriate standard in filing a motion.  The Court cannot act as an advocate for either party.  Plaintiff must state his argument, provide facts in support of his argument, and then cite to the record where those facts can be found.  This is not to say that if plaintiff properly briefed his motion for reconsideration that it would have merit.  Obviously, in deciding defendant's motion for summary judgment, the Court has read plaintiff's opposition brief and deposition transcripts in support thereof and neither contains grounds upon which to base a conspiracy claim.

discretion, refuse to consider such evidence.") (citing <u>Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.</u>, 680 F.Supp. 159, 162-63 (D.N.J. 1988)).  The non-party witnesses are all members of the plaintiff's family.  There is nothing to suggest that they were not available when defendants' motion for judgment on the pleadings was pending.  <u>See</u> <u>id.</u> (refusing to consider evidence which could and should have been submitted earlier).

Finally, there is no clear error of law or manifest injustice.  Plaintiff makes no argument that the Court's Order is based on an error of law or that reconsideration is necessary to prevent manifest injustice.  <u>See</u> <u>Max's Seafood Café</u>, 176 F.3d at 677.

For all these reasons, plaintiff's motion for reconsideration will be denied.

### IV.   <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion for summary judgment will be granted in part and denied in part.  Plaintiff's motion for reconsideration will be denied.


_____s/Noel L. Hillman_____
NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey
Dated: March 29, 2012

31